<hr/>

## JOHN A. DURDEN et al. v. THOS. W. SMITH et al.

1. PUBLIC WAR—SUSPENSION OF INTERCOURSE—BILL OF EXCHANGE—PROTEST.—Where a bill of exchange was drawn and indorsed by parties residing and doing business at Lexington, in this state, and accepted by parties residing and doing business in New Orleans, and transferred to parties in New York, dated 11th March, 1861, and due twelve months thereafter ; and the city of New Orleans was captured by the federal forces, in May, 1861, and held by them until the close of the war, and all intercourse between that place and Lexington, in this state, was prohibited by the force of public law ; and the bill was protested for non-payment, 24th February, 1863, nearly twelve months after it fell due ; the notary stated in his protest, that the office of the acceptors was closed, and there was no person about the premises of whom demand could be made, and that notice of protest was sent on the next day, through the post-office, postage paid, to the drawer and indorsers, at Lexington, Miss., their place of residence. *Held :* That this protest was not, under the special circumstances, within reasonable time, and it is not sufficient to fix the liability of the drawer and indorsers.

2. SAME.—The holders of the bill residing in New York were not required to transmit it to New Orleans, so long as civil war, military operations, or public authority suspended business intercourse between the two cities ; and the right of the plaintiffs to hold any communication in reference to the bill of exchange with the acceptors, so long as New Orleans was occupied and controlled by confederate authority, was cut-off and wholly suspended. So, after the capture of New Orleans by the federal forces, all intercourse of whatever nature, between it and Lexington, Miss., was prohibited by force of public law, and the proclamation of the president of the United States.

3. SAME.—War puts an end to all dealings and communications between people of belligerent nations; and they cannot commence or carry on any correspondence or business together, and partnership existing at the commencement of the war, between persons residing in the respective belligerent countries, are dissolved by the mere force and act of war. The Hoop, 1 Rob., 196; the Rapid, 8 Cranch, 155; the Joseph, ib., 455; 2 Wallace, 417.

4. NEGOTIABLE PAPER—DILIGENCE OF HOLDER.—The holder of negotiable paper is under a perpetual duty of diligence to make demand of the acceptor or drawer in order to hold the drawer or indorser liable; and although the prevalence of war, or other political causes may render a demand impracticable at maturity; yet, whenever the hindering cause ceases, he must act promptly and with reasonable diligence, otherwise such secondary parties will be discharged. Dunbar v. Tyler, *supra*.

5. SAME.—By the president's proclamation of 12th August, 1862, business and commercial relations between the cities of New York and New Orleans, were fully opened, after which time, said bill might have been presented for payment, and to hold up the same from that time until the 24th February, 1863, without an effort to collect it of the acceptors, was such gross laches as to discharge them from liability.

Error to the circuit court of Holmes county. SHACKELFORD, J.

The facts sufficiently appear in the opinion of the court.

Plaintiff in error assigned the following as error:

1st. The court below erred in overruling the demurrer of the defendants, to the declaration and amended declaration.

2d. The court erred in granting the instructions of the plaintiff, and in refusing to give the 1st, 2d, and 3d instructions of defendant.

3d. The court erred in overruling the motion of the plaintiff in error for a new trial.

*J. M. Dyer*, for plaintiff in error.

The holder cannot consult his pleasure as to the time of making the demand of payment after a bill becomes due. Such a course would expose the drawer to serious losses, when an early demand might have prevented. Story on Bills of Exchange, §§ 323, 324. This is the general rule, but the defendants have not brought themselves within any of the exceptions. That a war existed between the United States and the Confederate States, at the maturity of the draft, is true. The draft became due February 11th, 1862. New Orleans, where it was payable, was occupied by the United States forces, April 26, 1862, and constant communication

was kept up between that city and the city of New York, where the holders of the draft resided, until the war was over, yet payment was not demanded until February 24, 1863. Story on Bills, § 327; Chitty on Bills, 385, 524 (ed. 1833); Hopkirk v. Page, 2 Brock., 20. Was demand made thereafter as soon as practicable? Unquestionably not. After April 24th, 1863, the war ceased. In a short time after that date, commerce and business resumed their accustomed channels. There was no difficulty in presenting the draft in May, or certainly in June, 1862; yet it was not presented until many months after the obstructions had been removed.

A delay in giving notice, from the 10th to the 24th of a month, was held to be unreasonable. Hubbard v. Troy, 2 Iredell, 134; Am. Life Insurance & Trust Co. v. Emerson, 4 S. &. M., 117.

Notice was deposited in the post-office, not by the notary, but by his deputy. The fact must be proved by the deputy, or by some one who saw him deposit it.

The evidence of Graham, that his deputy gave notice, is hearsay, and therefore, is inadmissible. 1 Greenl., §§ 98, 99.

New Orleans was permanently held by the United States. Courts were opened, notaries were appointed, business, to a considerable extent, progressed in the usual manner, and, as against the United States, New Orleans ceased to be " enemy's territory." If the occupancy had been but a short time, it would have been too brief to have changed its relation to the Confederate States, as was held in Mrs. Alexander's case, referred to in Murrell v. Sones, 40 Miss., 575. In the case of the Circassian, 2 Wallace, 135, the question was, whether the port of New Orleans was in a state of blockade on the 4th of May, 1862, the day that vessel was captured, and the court held that it was still an enemy's port.

But for the sake of argument, let it be admitted that it was not necessary to demand payment of the draft, or give notice of its non-payment during the war. It was necessary to do so after the close of the war. Story says the presentment must be made as soon as it can be reasonably done

after the close of the war. Story on Bills of Exchange § 327; Chitty on Bills, 422, 423 (8th ed., 1833); Tunno v. League, 2 Johns., cases 1; Hofkirk v. Page, 2 Brock., 20.

It is admitted that Durden had made ample provision for the payment of the draft, and no question of want of funds can arise in this case. If the view that I have taken of the case is correct, it follows that the demurrer to the declaration should have been sustained. The objection to the declaration exists with even greater force to the first instruction given by the court for the plaintiffs below. That instruction in substance, declares that demand of payment on the 24th of February, 1863, and the depositing of notice in the post-office on that day, was sufficient to charge the defendants. The court erred in overruling the defendants 1st, 2d, and 3d instructions, which are the converse of plaintiff's first instruction.

The defendants in their 4th instruction, asked the court to instruct the jury, that if they believed from the evidence, that the notice of the protest was given by the deputy of the notary, that the fact could not be proven by the notary, unless he was present when it was deposited in the post-office. This instruction was erroneously refused. The proof is, that the notary did not give the notice. The action was against Durden, the maker of the bill of exchange, and Dyson and Bowers the indorsers of the bill; process was served upon all of them, and they pleaded jointly. The suit was dismissed as to Bowers, one of the indorsers. The defendants asked the court to instruct the jury, that that operated as a dismissal of it against Dyson, his co-indorser, which the court refused. This was error. Their liability was secondary to his, and dismissal as to them would work no injury to him, but Bowers' liability was joint as to Dyson, and dismissal as to him was prejudicial to Dyson.

In Smith v. Crutcher, 27 Miss., 456, it is decided that if the maker and indorsers are served with process, it would be error to dismiss as to the maker, and take judgment against the indorser, upon the ground that the maker is primarily liable.

*J. A. P. Campbell,* for defendants in error.

The instruction to the jury, asked and obtained in the circuit court, for the plaintiffs there, precisely applied to the facts in evidence, and the judgment below must stand or fall by the opinion entertained here of that instruction.

The bill of exchange, though not presented at maturity, because the city of New Orleans was in the hands of the Confederates, while the holders were in New York, was presented afterwards and protested, and notice deposited in the U. S. post-office at New Orleans. What more could the holders do? Where was the necessity for again presenting and protesting? Will not large allowance be made for the state of war at the time? It should be remembered that commercial intercourse with New Orleans by cities of the United States was not resumed immediately after the occupation of the city by forces of the U. S., but considerable time elapsed before the proclamation of the president of the United States announced an authorized resumption of trade and commerce with said city.

I am unable to furnish the date, or import of that proclamation, but am confident, that it has been the subject of reference and basis of decision by the supreme court of the United States.

The point made on the admissibility of the deposition, is covered by Chew et al. v. Read et al., 11 S. & M., 182.

Simrall, J.:

The survivors of the commercial firm of Henrys, Smith, & Townsend sued Durden, drawer, and Dyson and Bowers, indorsers of a bill of exchange, for $1,510 92, addressed to Block, McAfee & Co., New Orleans, and by them accepted. The bill is dated 11th March, 1861, Lexington, Mississippi, and due nine months after date. The bill was protested 24th February, 1863, for non-payment, the notary stating in his protest, that the office of the acceptors was closed, and no person was about the premises of whom demand could be made. The notice was on the next day deposited in the

post-office, postage prepaid, addressed respectively to the drawer and indorser, at Lexington, Mississippi. The plaintiffs, holders of the bill, were domiciled and residents of the city of New York.

The interesting question is, whether in the then condition of the country, the holders have used due diligence in making demand of the acceptors so as to charge the drawer and indorsers.

The bill was due the 14th of December, 1862, and should, on that day, have been presented for payment, unless a sufficient excuse has been shown.

The holders of the paper, being residents of the city of New York, could not be required to transmit the bill to New Orleans, so long as civil war, and military operations or public authority suspended business intercourse between the two cities. The city of New Orleans was captured by the United States forces, land and naval, the latter part of April, or the first of May, 1852 (the precise day not important to this case), and from thenceforth until the close of the war, remained in the possession and subject to the control of the United States. All intercourse, of whatever kind, between it and the town of Lexington, Mississippi, was cut off, and prohibited by force of public law, as well as the proclamation of the president, issued persuant to an act of congress. War puts an end to all dealings and communications between the peoples of the respective belligerents. The inhabitants of the belligerent states or countries cannot commence or carry on any correspondence or business together; partnerships, existing before and at the commencement of the war, between persons, residing in the respective belligerent countries, are dissolved, by the mere force and act of war. The Hoop, 1 Rob., 196; the Rapid, 8 Cranch, 155; the Joseph, ib., 455. These principles applied to the late civil war. Mrs. Alexander's case, 2 Wallace, 417.

The right of the plaintiffs, citizens of New York, to hold any communication, in reference to the bill of exchange, with the acceptors, so long as New Orleans was occupied,

and controlled by Confederate military forces, was cut off. Indeed, a right to receive the money, during that condition of things, did not exist; but was suspended until New Orleans was recovered to the possession of the United States, and intercourse between it and New York was opened.

It was declared in W. H. Dunbar v. Tyler, MS. opinion, which was a case somewhat like this, that the holder of negotiable paper was under a perpetual duty of diligence to make demand of the drawee or acceptor, in order to hold the drawer or indorser. And whilst the prevalence of war or other political causes, over which he had no control, or natural causes, such as ice, snow, floods, or epidemics, might render a demand impracticable, at maturity; yet, when the hindering cause ceased, he must act promptly and with reasonable diligence otherwise, the secondary parties will be discharged. The bill was due December 27th, 1861. At that time, presentment for payment was not only impracticable, but would have been unlawful. The plaintiffs were under no duty to the other parties to the bill to make an effort to call upon the acceptors, until intercourse was restored and permitted between the cities of New York and New Orleans. The late civil war, in some of its legal aspects, differed from any of which we have historical record. It was not merely a combination of a portion of the people, leagued in arms to make forcible resistance to the government and authority of the United States, but it was also territorial. The act of congress of July 13th, 1861, made it lawful for the president, by proclamation, to declare the inhabitants of any state or section of it, "in a state of insurrection against the United States; and, thereupon, all commercial intercourse between the same, and the citizens thereof, and the rest of the United States, shall cease and be unlawful, so long as such condition of hostility shall continue." The president, by virtue of this act, did, on the 16th of August, 1862, by proclamation, declare the state of Louisiana in a state of insurrection, and interdicted commerce, " except such portion as may, from time to time, be occupied and controlled by the forces of the United

States," etc.  The character of the " control " and " occupation," was defined in Mrs. Alexander's case, 2 Wallace, as a re-establishment of the national authority, and a permanent occupation.  This proclamation was restricted by a subsequent one, of March 31, 1863, " to the port of New Orleans." On the 12th of May, 1862, another proclamation, declaring that the blockade of the port of New Orleans shall cease and determine from and after the 1st of June, 1862, and that commercial intercourse might be carried on with it, " except as to persons and things, and information contraband of war."

From the 12th of August, 1862, commercial intercourse was restored between New Orleans and all other ports of the United States, except that portion under the control of the Confederate military power; and from the 1st of June of the same year, that port was opened to neutral commerce by a withdrawal of the blockade, except in articles contraband of war.

· The public facts to which reference has been made, show, that commerce and business was revived, by permission of the president, granted pursuant to the act of congress, on the 12th of August, 1862.  The testimony in the record is abundant, that business by sea, between New York and New Orleans, was resumed shortly after the capture of the latter city.  Indeed, no consideration of policy can be conceived which would have dictated a restraint in the collection of debts due from parties in New Orleans, to others not within the Confederate military lines, after a complete restoration of the national authority.  Whether business communication was opened practically, earlier than the 12th of August, 1862, the date of the proclamation, is wholly immaterial to this case.  We are clearly of the opinion, that to hold up the bill until the 24th of February, 1863, before an effort was made to collect it of the acceptors, was gross laches on the part of the holders.  No condition of things will excuse the holder from his duty to present the bill for payment, if it be practicable to do so.  Causes may intervene, beyond his control, which suspend and postpone the performance of the act, but

do not dispense with it when it becomes practicable. The want of funds; the absence of a right to draw, and, of a reasonable expectation of payment, absolve from the necessity of giving notice to secondary parties. But these things furnish no pretext for not making demand of the drawer or acceptor.

For the want of the prompt diligence required by law, in making the demand, the drawer and indorsers are discharged. It follows, that the instruction granted on the prayer of the plaintiff, was erroneous. This instruction assumed that a presentment, on the 24th of February, 1863, was in due time. The proclamations of the president, and the acts of congress, gave notice to all parties interested, of the condition of things upon which business communications would be resumed. That resumption, in point of fact, did take place several months before the bill was presented.

The judgment is reversed, and cause remanded for a new trial.